# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**KAREN L. KARST,**

**Plaintiff,**

-vs-                                                **Case No.  6:04-cv-1597-Orl-19DAB**

**COMMISSIONER OF SOCIAL SECURITY,**

**Defendant.**

_____

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT**

The Plaintiff brings this action pursuant to the Social Security Act (the Act), as amended, Title 42 United States Code Section 405(g), to obtain judicial review of a final decision of the Commissioner of the Social Security Administration (the Commissioner) denying her claim for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) benefits under the Act.

The record has been reviewed, including a transcript of the proceedings before the Administrative Law Judge (ALJ), the exhibits filed and the administrative record, and the pleadings and memoranda submitted by the parties in this case.  Oral argument was held on November 22, 2005.

For the reasons that follow, it is **RECOMMENDED** that the decision of the Commissioner be **AFFIRMED.**

# I. BACKGROUND

## A.       Procedural History

Plaintiff filed for a period of disability, DIB and SSI benefits on February 15, 2001. R. 53-55. She alleged an onset of disability on July 26, 2000 due to migraines, back pain  and depression/anxiety disorders.   R. 53-55, 63.   Her application was denied initially and upon reconsideration.   R. 36-37, 40-41.   Plaintiff requested a hearing, which was held on July 1, 2003, before Administrative Law Judge Albert D. Tutera (hereinafter referred to as "ALJ").   R. 286-304. In a decision dated August 26, 2003, the ALJ found Plaintiff not disabled as defined under the Act through the date of his decision.  R. 21-29.  Plaintiff timely filed a Request for Review of the ALJ's decision.  R. 17.  The Appeals Council denied Plaintiff's request on September 10, 2004.  R. 5-8. Plaintiff filed this action for judicial review on October 29, 2004.  Doc. No. 1.

## B.       Medical History and Findings Summary

Plaintiff's medical history is set forth in detail in the ALJ's decision.  By way of summary, Plaintiff complained of headaches, depression, anxiety disorder, and back problems.  R. 22.  After reviewing Plaintiff's medical records and Plaintiff's testimony, the ALJ found that Plaintiff suffered from degenerative disc disease of the spine and headaches, which were "severe" medically determinable impairments, but were not impairments severe enough to meet or medically equal one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4. R. 25.  The ALJ determined that Plaintiff retained the residual functional capacity (RFC) to perform light work, as she could lift/carry 20 pounds occasionally and 10 pounds frequently and she could sit/stand and walk for up to six hours in an eight-hour workday and that she had postural limitations for occasional climbing, and occasional balancing, stooping, kneeling, crouching, and crawling.  R. 28.  The ALJ found that

Plaintiff's nonexertional limitations had resulted in only mild difficulty in activities of daily living due to pain, moderate difficulties in social functioning because she preferred insolation, and mild difficulties in maintaining concentration persistence and pace, and that Plaintiff had no repeated episodes of decompensation.  R. 28.  The ALJ found that Plaintiff's capacity for light work was substantially intact and had not been compromised by any nonexertional limitations R. 29.  In making this determination, the ALJ found that Plaintiff's allegations regarding her limitations were not fully credible for the reasons set forth in the body of the decision.[1] R. 25.  Based upon Plaintiff's RFC, the ALJ determined that she could not perform past relevant work.  R. 28.  Considering Plaintiff's vocational profile and RFC, the ALJ applied the Medical-Vocational Guidelines (the grids), 20 C.F.R. Pt. 404, Subpt. P, App. 2, and concluded that Plaintiff could perform work existing in significant numbers in the national economy.  R. 28.  Accordingly, the ALJ determined that Plaintiff was not under a disability, as defined in the Act, at any time through the date of the decision.  R. 29.

Plaintiff now asserts three points of error.  First, Plaintiff claims the ALJ erred by applying the incorrect legal standards when considering Plaintiff's headaches because his findings were not supported by the medical evidence.  Second, she asserts that the ALJ erred by improperly applying the pain standard and in evaluating her credibility.  Third, she argues that the ALJ erred by relying upon the grids, rather than obtaining vocational expert (VE) testimony, because Plaintiff suffered non-exertional impairments.  All issues are addressed, although not in the order presented by Plaintiff.  For the reasons that follow, it is respectfully **RECOMMENDED** that the decision of the Commissioner be **AFFIRMED**.

---

[1] Within the body of the decision, the ALJ discredited Plaintiff's reported limitations based on several specific inconsistencies between those limits, Plaintiff's stated daily and vacation activities, and the medical evidence.  R. 25.

## II.  STANDARD OF REVIEW

The scope of this Court's review is limited to determining whether the ALJ applied the correct legal standards, *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988), and whether the findings are supported by substantial evidence, *Richardson v. Perales*, 402 U.S. 389, 390 (1971).   The Commissioner's findings of fact are conclusive if supported by substantial evidence.   42 U.S.C. § 405(g).  Substantial evidence is more than a scintilla – *i.e.,* the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.  *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995), (citing *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) and *Richardson*, 402 U.S. at 401).

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.  *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991).  The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.  *Foote*, 67 F.3d at 1560; *accord, Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (court must scrutinize the entire record to determine reasonableness of factual findings).

The ALJ must follow five steps in evaluating a claim of disability.  *See* 20 C.F.R. §§ 404.1520, 416.920.  First, if a claimant is working at a substantial gainful activity, she is not disabled.  29 C.F.R. § 404.1520(b).  Second, if a claimant does not have any impairment or combination of impairments which significantly limit her physical or mental ability to do basic work activities, then she does not

have a severe impairment and is not disabled.  20 C.F.R. § 404.1520(c).  Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she is disabled.  20 C.F.R. § 404.1520(d).  Fourth, if a claimant's impairments do not prevent her from doing past relevant work, she is not disabled.  20 C.F.R. § 404.1520(e).  Fifth, if a claimant's impairments (considering her residual functional capacity, age, education, and past work) prevent her from doing other work that exists in the national economy, then she is disabled.  20 C.F.R. § 404.1520(f).

### A.    Headaches

Plaintiff claims that the ALJ should not have found her able to perform light work given her limitations from headaches and side effects, precluding the performance of light work.  Plaintiff contends that the ALJ did not properly weigh all of the evidence regarding her headaches; did not make clear the weight accorded to each item of evidence on the issue of how her headaches affected her ability to perform substantial gainful activity; and did not determine whether her headaches limited her ability to perform work for any twelve month period prior to August 26, 2003.  The Commissioner contends that substantial evidence supports the ALJ's determination of the effect of Plaintiff's headaches on her residual functional capacity.

Residual functional capacity is an assessment based on all relevant evidence of a claimant's remaining ability to do work despite her impairments.  20 C.F.R. § 404.1545(a); *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997).  The focus of this assessment is on the doctor's evaluation of the claimant's condition and the medical consequences thereof.  *Id.*  Substantial weight must be given to the opinion, diagnosis and medical evidence of a treating physician unless there is good cause to do otherwise.  *See Lewis*, 125 F.3d at 1440; *Edwards*, 937 F.2d at 583; 20 C.F.R. §§ 404.1527(d),

-5-

416.927(d).  If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).  Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments.  *See Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986); *see also Schnorr v. Bowen*, 816 F.2d 578, 582 (11th Cir. 1987).

The ALJ found that the medical evidence indicated the claimant experienced headaches.  R. 25.  However, he also found that the medical records indicated "medication effectively controls her headache and neck pain and she has been able to sleep better."  R. 26.  The ALJ noted further that on March 23, 2003, Dr. Kane reported that the claimant was having fewer headaches and her "progress was good."  R. 25.  He also noted that physical examinations with Dr. Collins during the period at issue had been essentially unremarkable.  R. 23 (referring to R. 193-207).

As evidence of the headaches affecting her RFC, Plaintiff points to medical records from prior to 2003:  Martin S. Kane, M.D.'s (Plaintiff's treating psychiatrist's) repeated notations of headaches and/or migraine headaches between March 2, 2000 and October 8, 2002.  R. 227-52, 257-58, 271. Plaintiff also points to Dr. Collins' records of Plaintiff's reports of "chronic daily headache" on November 8, 2001, January 11, 2002, April 4, 2002, April 16, 2002, and July 16, 2002.  R. 193-98. A third physician, Dr. Michael J. Creamer, diagnosed "headache symptomology . . . with evidence suggestive of occipital neuralgia" on August 7, 2002.  R. 225.

As of April 3, 2003, when Dr. Creamer prescribed MS IR 10 mg, #60 for neck and headache pain, Plaintiff appeared to improve significantly.  R. 270.  At her next visit, on May 7, 2003, Plaintiff

reported that she was feeling much better on Trazadone and MS IR and she was able to discontinue

taking Excedrin and aspirin altogether.   R. 269.   Although the medical records indicated this

improvement in her headaches, just two months later, at the hearing on July 1, 2003, Plaintiff testified

that:

> I still have the same old headache. It's just that morphine's covering it up a little bit
> and he doesn't want me on morphine forever so we're still working together, but I get
> the headaches about - well, as soon as the morphine starts wearing off – I take like
> three [doses] a day every six hours.

R. 290.  Plaintiff referred to her earlier headache pain: "Like – the easiest way I can describe it is

super tightness in my shoulders and a toothache in my head." R. 291.  "I mean this is before I was

taking morphine. I wasn't sleeping.  I was up all night.  I couldn't do any activity. . . . I'd say without

the morphine for a period of time like two years I was just suffering with depletion from the

headaches, no sleep, no eating, throwing up." R. 291, 295.

Plaintiff points to Dr. Kane's opinion that Plaintiff's "headaches cause problems with ability

to maintain consistent employment."  R. 235.  Plaintiff contends that the ALJ did not consider the

severity of Plaintiff's headaches between the onset of her disability, July 26, 2000 and the date she

started to take the medication prescribed by Dr. Creamer, April 3, 2003, even though morphine was

not prescribed during 2000, 2001, 2002, and the first part of 2003.  She argues that the medication did

not "effectively control" her headaches because she testified that she still suffered headaches. R. 269

("She does report that her headache worsens when she has anxiety.").

The ALJ specifically discussed Dr. Kane's Psychiatric Mental Health Report, but did not

credit the portion of Dr. Kane's opinion that Plaintiff's "headaches cause problems with ability to

maintain consistent employment."  R. 235.  Dr. Kane qualified this opinion regarding Plaintiff's

headaches in two ways and the ALJ did not accord it controlling weight. Dr. Kane placed his opinion about Plaintiff's headache problems in parenthesis in the midst of a paragraph otherwise addressing Plaintiff's mental health, for which he was Plaintiff's treating psychologist.  R. 235.  Second, Dr. Kane did not intend to address the issue:

> No problems with sustained concentration, understanding, memory, persistence due to mental health issues.  (Headaches cause problems with ability to maintain consistent employment *but I will not deal with that issue here*.)  Social interaction is slightly impaired.  No significant adaptation issues.

R. 235 (emphasis added).  While the ALJ gave Dr. Kane's opinion, as the treating psychologist, on Plaintiff's mental health and depression controlling weight (R. 24, 26), it was not entitled to such weight on the issue of headaches, which were treated by Plaintiff's neurologist and rehabilitation doctors.  As pointed out by the Commissioner, Plaintiff's neurologist responsible for treating her for headaches, Dr. Honeycutt, did not indicate that Plaintiff was disabled from work due to her headaches.  R. 23, 175-86.

The Commissioner points to Plaintiff's treatment records from Dr. Honeycutt which showed lengthy periods between sporadic visits, when Plaintiff did not seek treatment for her headaches: seven months (January to August 2000); six months (September 2000 to February  2001); eight more months (to October 2001); three month (to January 2002); and four months (May 1, 2002).  R. 175-89.

As of January 28, 2000, Plaintiff appeared to Dr. Honeycutt to "overall . . . be doing very well" and that new medication had improved her sleeping "dramatically" and that her "headaches had also improved."  R. 186.  Although Plaintiff asked for an analgesic to help deal with her chronic daily headaches, Dr. Honeycutt opined "given her history of analgesic abuse in the past, we should probably avoid this if possible."  R. 186.  Also during the time period in dispute, on October 31, 2001,

Dr. Honeycutt opined that Plaintiff's "chronic daily tension-type headaches" were "most likely . . . analgesic rebound headaches" because "she is taking Excedrin Migraine around the clock and also taking Ativan frequently." R. 180.  Dr. Honeycutt told Plaintiff to try to reduce the amount of Ativan and Excedrin. R. 180.  Plaintiff had been told previously, since her gastric ulcer removal, to avoid analgesics altogether.

On  November 8, 2001, Dr. Collins (treating her for vertigo and inner ear problems) again "strongly urged" Plaintiff to discontinue daily aspirin use because her "history of significant upper GI bleed in October 1999 secondary to nonsteroidal use." R. 198.  She was placed on Celebrex that was "helping with her headaches" and "looked very well" and was "without complaint." R. 198.  As of January 21, 2002, it is clear that Dr. Honeycutt believed Plaintiff's headaches to be resolving after trying different medications: "She is currently taking Axert . . . and she reports that this regimen successfully aborts her migraine headaches throughout the day.  She awakens every morning with a migraine, however, raising the concern of rebound headaches. . . I pointed out, however, that the Axert could be producing rebound headache syndrome since she is taking it daily." R. 178.

On February 21, 2002, Dr. Honeycutt noted that Plaintiff's headaches had improved (R. 197), and on April 4, 2002, the impression was that Plaintiff's headaches had improved. R. 196.  On May 1, 2002, Plaintiff reported that her headaches had totally resolved for approximately a month after Depakote was increased (in October 2001 – R. 180), and with changes in her other medications, "her daily headaches were redeveloping at this point, but were "much less severe and tolerable at their current severity." R. 175.  At that time, on May 1, 2002, Dr. Honeycutt told Plaintiff "she should use abortive analgesic medications no more frequently than one or two times per week." R. 175.  There were several other doctor visits during the relevant period when Plaintiff did not complaint about

headaches or she described them as mild.  *See, e.g.,* R. 203 (November 27, 2000); R.202 (January 23, 2001); R. 201 (March 27, 2001-having no significant headaches); R. 199 (October 9, 2001).

In August of 2002, Plaintiff began seeing Dr. Creamer at the Rehabilitation Medical Group for pain treatment.   R. 214.  After a series of nerve blocks, on August 28, 2002, Plaintiff reported "significant reduction of headache pain with less medication and also improved functional mobility with recent reduction of headache pain."  R. 218.  On September 6, 2002, Dr. Creamer noted that Plaintiff reported "significant reduction of headache pain.  With a reduction of medication, she reports that her pain initially when seeing me was 10 out of 10 and is now reduced to a 3 or 4 out of 10 with a marked improvement in functional mobility and activity level."  R. 216.

In addition, Plaintiff's sleep study on July 14, 2002 for sleep apnea showed that she had "unexpectedly severe sleep apnea" for her non-obese size, and that upon awakening after the study wearing the recommended CPAP mask, she "reported less headache" and feeling "better rested."  R. 192.  Dr. Creamer, treating Plaintiff for pain, opined that he suspected her sleep apnea was contributing to her headache symptomology.  R. 268 (December 11, 2002).  Although Plaintiff had the equipment, she reported that the mask was not well fitted and she only used it a few hours during the night without much success: "Overall, it is difficult to say if she has consistently and compliantly used her CPAP and therefore it is difficult to tell if this indeed is helping her in any way."  R. 253.[2] As of February 19, 2003, Plaintiff was admittedly not using the mask because she had a "claustrophobic" feeling about it.  R. 255.  As Dr. Kane noted with frustration, Plaintiff also declined

---

[2]On a similar note, Plaintiff often failed to take prescribed iron after her hospital discharge, although the medical records showed physicians to be concerned about her chronic anemia.  *See, e.g.,* R. 247.

to exercise on a consistent basis against medical advice: "She never engaged in any exercise as recommended by Dr. Honeycutt.  She uses her headache as an excuse."  R. 251.

Plaintiff also contends that the ALJ failed to consider the side effects of the medication prescribed to Plaintiff during 2000 to mid-2003.  Plaintiff testified at the hearing on July 1, 2003 that she felt "kind of sluggish in the morning" with "some nausea sometimes." R. 298.  "From like 8:00 to 1:00 I don't do anything because I let my medications from nighttime wear off. . . . I drive between the hours – when I can – when I want to do something and I feel like I can do it I drive between the hours of about 1:00 and 6:00."  R. 295, 297.

During the hearing, the ALJ asked Plaintiff several times about her headaches or side effects and her answers were consistently qualified that she was describing the time period "before the morphine."  The ALJ specifically asked: "Besides the pain, any other symptoms that you're having with theses headaches?"  R. 291.  She responded, "Well, of course they make me, you know – *I mean this is before I was taking morphine.  I wasn't sleeping.*  I was up all night.  I couldn't do any activity."  R. 291 (emphasis added).  The ALJ asked again, "Besides . . . pain, what other headache symptoms are you having or is that it?"  R. 291-92.  Plaintiff's responded, "Okay.  I would say I'm being treated for this and the top of my head."  R. 292.  Later on in the hearing, Plaintiff testified, "I'd say *without the morphine* for a period of time like two years I was just suffering with depletion from the headaches, *no sleep*, no eating, throwing up.  So, I feel more secure about my depression situation now . . . the headaches – I've had many doctors tell me they don't know if the headaches or the depression came first."  R. 295 (emphasis added).  When the ALJ asked Plaintiff about whether she exercised, Plaintiff answered: "[F]or a long time actually *until I was on the morphine* – I wasn't – the pain in my head – if you put a toothache in your head – I really wasn't capable."  R. 297-98 (emphasis

added).   Finally, when the ALJ asked Plaintiff specifically about side effects from her medications, she again qualified her answer: "Like I said I'll drive until – I feel very – just kind of sluggish in the morning, very – I have some nausea sometimes. *When the headaches were there* – that was my whole day *when the headaches were there*." R. 298 (emphasis added).  It is clear from Plaintiff's responses that she had experienced improvement in her headaches once she began treatment with the MSIR in April 2003.

As Plaintiff points out, the medical records reflect on one occasion that Plaintiff reported to Dr. Kane (not the prescribing physician) fatigue right after starting to take Depakote R. 237 - June 25, 2001); she also reported to Dr. Honeycutt on October 31, 2001 that the Depakote had caused somnolence.  R. 180.  However, in his notes reflecting Plaintiff's complaints of drowsiness on October 31, 2001, Dr. Honeycutt noted his skepticism of Plaintiff's reports that she "increased her Depakote ER dose to two tablets a day and began to experience somnolence and therefore discontinued the medication(?).  The patient also reports that the efficacy of the Depakote became less effective after several weeks of treatment(?)." R. 180 (question marks in original).

When Plaintiff complained of somnolence from the Depakote on October 31, 2001, she had already been taking it for over a year.  Dr. Honeycutt, her neurologist first prescribed Depakote to Plaintiff on August 10, 2000. R. 185.  She was started on Depakote 250 mg. and told to increase the dose to 500 mg thereafter if her headaches continued and no side effects were present. R. 185.  At her next appointment on September 19, 2000, she stated the Depakote 250 mg and another medication were improving her sleep.  R. 183.  At the next visit to Dr. Honeycutt, on February 27, 2001, Dr. Honeycutt did not note any side effects from the Depakote because Plaintiff reported to him that she

had "discontinued Depakote since her last visit." R. 182. In reality, she consistently reported continuing to take it for another year, based on the notes of appointments with Dr. Honeycutt (*see, e.g.,* R. 175, 176, 179-80).

More significantly, it appears that Plaintiff's physician modified her medication regimen when she complained of feeling "oversedated." *See* R. 175. On January 21, 2002, Dr. Honeycutt adjusted Plaintiff's dose of Trazodone and discussed reducing or eliminating the dosage of another drug (Axert) that he believed could be causing rebound headaches; again, he does not mention the somnolence. R. 178.

On May 1, 2002, Plaintiff reported that the increase in Trazodone, in tandem with the Depakote, was causing her "oversedation," so she took less of the other medications, which made her headaches redevelop, but they were "much less severe and tolerable at their current severity." R. 175. During the time that Plaintiff received nerve blocks and trials of headache medications from Dr. Creamer at the Rehabilitation Medical Group (beginning in August 2002) Plaintiff reported a reduction of headache pain without complaining of sleepiness or drowsiness. R. 214-18.

The ALJ relied on and cited the more recent evidence from 2003, that Plaintiff's condition had improved on a different medication, the morphine, which she took twice a day. R. 24. Plaintiff was first prescribed the MSIR – morphine: immediate release – for treatment of her headaches on April 3, 2003 by Dr. Creamer at the Rehabilitation Medical Group. R. 270. At her next appointment, Plaintiff reported "feeling much better on the current regimen" without any complaints of drowsiness or sleepiness, and that she was able to discontinue aspirin and Excedrin altogether since the start of the MSIR. R. 269. At an April 23, 2003 appointment with Dr. Kane, Plaintiff reported her headaches

were less on the "time release morphine bid [twice a day]"; she reported reduced appetite and confusion, but did not complaint of drowsiness.  R. 271.

Accordingly, good cause existed for the ALJ's reliance on the more recent evidence of Plaintiff's improvement in her headaches and his rejection of earlier headache symptoms or side effects from the Depakote.

### B.    Pain and credibility.

Plaintiff asserts that the ALJ erred in evaluating her pain due to disc problems documented by the medical evidence.  She also argues that the ALJ erred by finding her subjective complaints credible only to the extent she is limited to light work.  She contends that the record demonstrates her credibility and that the ALJ failed to provide adequate and specific reasons for discrediting her complaints.  The Commissioner responds that the ALJ's thorough review of the entire record met regulatory criteria and case law.

Pain is a non-exertional impairment.  *Foote v. Chater*, 67 F.3d 1553, 1559 (11th Cir. 1995).  The ALJ must consider all of a claimant's statements about his symptoms, including pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence.  20 C.F.R. § 404.1528.  In determining whether the medical signs and laboratory findings show medical impairments which reasonably could be expected to produce the pain alleged, the ALJ must apply the Eleventh Circuit's three-part "pain standard":

> The pain standard requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.

*Foote*, 67 F.3d at 1560 (quoting *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991)).  Pain alone

can be disabling, even when its existence is unsupported by objective evidence, *Marbury v. Sullivan*,

957 F.2d 837, 839 (11th Cir. 1992), although an individual's statement as to pain is not, by itself,

conclusive of disability.  42 U.S.C. § 423(d)(5)(A).

Although the ALJ did not refer to the Eleventh Circuit's pain standard as such, he clearly was

aware of the governing standards for evaluating subjective complaints because he cited the applicable

regulations and Social Security Ruling ("SSR") 96-7p.  R. 25.  *See Wilson v. Barnhart*, 284 F.3d

1219, 1225-26 (11th Cir. 2002) (per curiam) (ALJ properly applied the Eleventh Circuit pain standard

even though he did not "cite or refer to the language of the three-part test" as "his findings and

discussion indicate that the standard was applied").  Moreover, the ALJ complied with those

standards.  He obviously determined that Plaintiff had an objective medical condition, back pain, that

could give rise to the alleged symptoms, because otherwise the ALJ would not be required to assess

the credibility of the alleged complaints.

Having concluded that he had to make a credibility determination of Plaintiff's subjective

complaints, the ALJ plainly recognized that he had to articulate a reasonable basis for his

determination.   In that respect, in discussing Plaintiff's RFC, the ALJ stated,

> Considering the claimant's statement of record in connection with the medical
> evidence, the undersigned finds that her statements are not fully credible and not
> persuasive of an inability to perform work-related activities.  She alleges depression,
> anxiety and headaches and she testified that she experiences fear of people and does
> not like malls or groups, has crying spells, does very little in terms of daily activities
> and stays indoor.  However, in a statement of record she indicated that she prepares
> simple meals, can perform quick errands when needed, does most of her shopping, and
> performs light cleaning and laundry.  She occasionally goes out with friends and
> relatives and gets along with friends and family, people in authority and the public.
> On February 12, 2001, Dr. Kane indicated that the claimant "filed for disability, just
> to see how it works."  Her depression and anxiety are related to situational issues in

her life, *i.e.*, the death of her father, breaking up with her boyfriend, and relationship with family.  She was able to go on vacation to South Florida from August 11 to 18, 2000.  The medication effectively controls her headache and neck pain and she has been able to sleep better.

R. 25-26.[3]

Plaintiff contends that participation in everyday activities of short duration does not disqualify her from being disabled.  *Lewis v. Callahan*, 125 F.3d 1436, 1441 (11th Cir. 1997).  She argues that admitting that she can prepare a simple meal, run a quick errand, participate in everyday activities of short duration, or go out socially is not the equivalent of performing substantial gainful activity on a regular and continuing basis.  As objective evidence supporting her pain testimony, Plaintiff points to her MRI from 2003 which showed a central disc protrusion at C4-5 with mild bulges at C4-5 and C6-7.  R. 267.  Dr. Creamer opined Plaintiff had cervical radiculopathy most likely related to C5 nerve root inflammation and irritation from her disc disease. R. 267.  In addition to the evidence of headache pain, Plaintiff cites evidence of her chronic neck, shoulder and right arm pain on August 7, 2002. R. 225.  As the Commissioner correctly contends, a claimant's daily activities and course of treatment may be considered when evaluating and discrediting her testimony regarding pain and other subjective symptoms. *See Wolfe*, 86 F.3d at 1078; *Macia v. Bowen*, 829 F.2d 1009, 1012 (11th Cir. 1987) (the ALJ may consider evidence regarding a plaintiff's daily activities at the fourth step of the sequential evaluation).

Where an ALJ decides not to credit a claimant's testimony about pain, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding.

---

[3]As the Commissioner notes, the ALJ considered the opinions of State agency medical experts who reviewed the medical evidence and determined that Plaintiff's headache impairment did not affect her ability to function and, thus, was not severe. R. 26, 152, 154. Although the ALJ did not accord full weight to their opinion, he was entitled to consider it and accord it the appropriate weight. See Social Security Ruling (SSR) 96-6p.

*Jones v. Dep't of Health and Human Servs.*, 941 F.2d 1529, 1532 (11th Cir. 1991) (articulated reasons must be based on substantial evidence). A reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence in the record. *Foote*, 67 F.3d at 1561-62; *Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988).

Here, the ALJ offered specific reasons for discrediting Plaintiff's subjective complaints. The ALJ's reasons included inconsistencies between her reports and the examination findings, as well as inconsistencies between her statements and her activities of daily living or more demanding activities, such as out-of-town vacations. These are factors the ALJ is directed to consider. 20 C.F.R. §§ 404.1529, 416.929. Moreover, the ALJ's reasons were supported by substantial evidence. The ALJ noted that on February 12, 2001, Dr. Kane indicated that Plaintiff applied for disability "just to see how it worked." R. 25, 242. Plaintiff also wrote that she "may need to return to work to eat" but that if she did go back, she would "limit gross monthly earnings to no more than $740," presumably so that she would continue to qualify for disability. R. 55 (April 18, 2001). On May 23, 2001, when Plaintiff was seen for an evaluation of her episodic vertigo, the physician who evaluated her vertigo, Dr. Clark, wrote to Dr. Honeycutt on three occasions that Plaintiff's alleged symptoms were suspicious, and not consistent with clinical findings. R. 107-08, 110-11. The ALJ's determination that Plaintiff's statements about her pain were not fully credible is supported by substantial evidence.

### C.   Application of the grids

Plaintiff claims that because she had pain from degenerative disc disease and headaches, she had nonexertional limitations, precluding the application of the grids and requiring VE testimony. She also claims that her pain, dizziness, and medication side effects were non-exertional limitations which made the ALJ's use of the grids improper and inconsistent with his other findings that those

-17-

impairments are severe. R. 25. She argues that these limitations would necessarily compromise her capacity for the full range of light work. The Commissioner contends the ALJ's reliance on the grids was appropriate.

Once the ALJ finds that a claimant cannot return to her prior work, the burden of proof shifts to the Commissioner to establish that the claimant court perform other work that exists in the national economy. *Foote*, 67 F.3d at 1558. In determining whether the Commissioner has met this burden, the ALJ must develop a full record regarding the vocational opportunities available to a claimant. *Allen v. Sullivan*, 880 F.2d 1200, 1201 (11th Cir. 1989). This burden may sometimes be met through exclusive reliance on the "grids." *Foote*, 67 F.3d at 1558. Exclusive reliance on the "grids" is appropriate where the claimant suffers primarily from an exertional impairment, without significant non-exertional factors. 20 C.F.R. Part 404, Subpart P, Appendix 2, § 200.00(e); *Foote*, 67 F.3d at 1559; *Heckler v. Campbell*, 461 U.S. 458 (1983) (exclusive reliance on the grids is appropriate in cases involving only exertional impairments, impairments which place limits on an individual's ability to meet job strength requirements).

Exclusive reliance is not appropriate "either when a claimant is unable to perform a full range of work at a given residual functional level or when a claimant has a non-exertional impairment that significantly limits basic work skills." *Walter v. Bowen*, 826 F.2d 996, 1002-03 (11th Cir. 1987). In almost all of such cases, the Commissioner's burden can be met only through the use of a VE. *Foote*, 67 F.3d at 1559. It is only when the claimant can clearly do unlimited types of work at a given residual functional level that it is unnecessary to call a VE to establish whether the claimant can perform work which exists in the national economy. In any event, the ALJ must make a specific finding as to whether the non-exertional limitations are severe enough to preclude a wide range of

employment at the given work capacity level indicated by the exertional limitations. *Foote*, 67 F.3d at 1559.

The ALJ found that Plaintiff has postural limitations, some limitations on her ability to balance, stoop, kneel, crouch and crawl, moderate difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence or pace, and mild difficulties in activities of daily living because of her pain. R. 28.  As the Commissioner argues, use of the grids may be appropriate even in cases involving nonexertional limitations, but the ALJ must make a specific finding that the nonexertional limitations are not significant enough to prevent a wide range of gainful employment at the designated level. *See Sryock v. Heckler*, 764 F.2d 834, 836 (11th Cir. 1985).  If the ALJ determines the nonexertional limitations do not significantly limit basic work skills at the designated level, then reliance on the grids is appropriate. *Phillips*, 357 F.3d at 1243.

In this case, the ALJ found that Plaintiff had the RFC for light work[4] because she could lift/carry 20 pounds occasionally and 10 pounds frequently and that she could sit/stand and/ walk for up to 6 hours in an 8 hour day.  R. 28, Finding No. 7.  The ALJ also found Plaintiff had postural limitations for occasional climbing of ramp/stairs/ladder/rope/scaffolds, balancing, stooping, kneeling, crouching, and crawling. R. 28, Finding No. 7.  The ALJ found that Plaintiff's capacity for light work was substantially intact and had not been compromised by her nonexertional limitations R. 29), finding her statements regarding her headache and back pain to be not fully credible and not persuasive of an inability to perform work-related activities.  R. 25.

---

[4]"Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities."  20 C.F.R. §§ 404.1567(b), 416.967(b).

As to the specific  postural limitations for occasional climbing of ramps, stairs, ladders, ropes, and scaffolds or balancing, stooping, kneeling, crouching, and crawling, the Social Security Regulations state that the inability to ascend or descend scaffolding, poles, and ropes as well as the inability to crawl on hands and knees are nonexertional limitations or restrictions which have very little or no effect on the unskilled light occupational base.  SSR 83-14 (Doc. No. 14 att.).  "Relatively few jobs in the national economy require ascending or descending ladders and scaffolding."  SSR 83-14 (Doc. No. 14 att.).  Some limitation in climbing and balancing would not ordinarily have a significant impact on the broad world of work; crawling on hands and knees or kneeling are relatively rare activities and limitations on the ability to crawl or kneel are of little significance in the broad world of work.  SSR 85-15 (Doc. No. 14 att.).  The regulations state that "to perform substantially all of the exertional requirements of most sedentary and light jobs, a person would not need to crouch and would need to stoop only occasionally."  SSR 83-14.  "If a person can stoop occasionally (from very little up to one-third of the time) in order to lift objects, the sedentary and light occupational base is virtually intact."  SSR 85-15.  Limitations of the ability to ascend or descend ladders and scaffolding, kneel, and crawl as part of the work requirement do not significantly affect the occupational base at the light level. SSR 83-14.

In this case, in accordance with the Social Security regulations, the ALJ properly considered Plaintiff's postural limitations for occasional climbing, balancing, stooping, kneeling, crouching, and crawling, and assigned an RFC for light work.  The ALJ further specifically found that Plaintiff's capacity for light work was substantially intact and had not been compromised by any nonexertional limitations. R. 29, Finding 14.  Because Plaintiff could perform substantially a wide range of limited types of work at the light level, it was unnecessary to call a VE to establish whether she could perform

work existing in the national economy.  *See Foote*, 67 F.3d at 1559.  Accordingly, the ALJ was justified in his reliance upon the grids.  *See id.*

### IV.  CONCLUSION

The record in this case shows that Plaintiff does not enjoy full health and that her lifestyle and activities are affected by her ailments to some degree.  The ALJ appropriately considered these circumstances and analyzed them in relation to the exacting disability standard under the Social Security Act.  For the reasons set forth above, the ALJ's decision is consistent with the requirements of law and is supported by substantial evidence.  Accordingly, it is respectfully **RECOMMENDED** that the Commissioner's decision be **AFFIRMED** pursuant to sentence four of 42 U.S.C. § 405(g). If the decision is affirmed, it is recommended that the Clerk of the Court be directed to enter judgment consistent with this opinion and, thereafter, to close the file.

Failure to file written objections to the proposed findings and recommendations contained in this report within ten (10) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

Recommended in Orlando, Florida on January 13, 2006.

*David A. Baker*

DAVID A. BAKER
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Presiding District Judge
Counsel of Record
Courtroom Deputy